Date signed September 12, 2011



THOMAS J. CATLIOTA
U. S. BANKRUPTCY JUDGE

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF MARYLAND
### at Greenbelt

| | | | |
|---|---|---|---|
| In Re: | * | | |
| Auto Showcase of Laurel, LLC | * | Case No. | 09-14731-TJC |
| | * | Chapter | 11 |
| Debtor | * | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | | |
|---|---|---|---|
| In Re: | * | Case No. | 11-13889-TJC |
| S & A Realty, Inc. | * | Chapter | 11 |
| Debtor | * | Jointly Administered | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### <u>MEMORANDUM OF DECISION</u>

S & A Realty, Inc. (the "Debtor") filed this motion to reject its lease with A&H

Motors, Inc. (the "Tenant").  The Debtor seeks to reject the lease so that it can sell the

leasehold property to a buyer who will then lease it and provide inventory financing to

Auto Showcase of Laurel, LLC ("Auto Showcase").  Auto Showcase is an affiliate of the

Debtor that is also the subject of a chapter 11 bankruptcy proceeding in this Court.  The

Debtor contends that the Tenant is in material breach of the lease and has forfeited any

1

rights to remain in possession under 11 U.S.C. §365(h).[1]  The Tenant opposes the motion and contends that the Debtor's and Auto Showcase's refusal to vacate the leasehold property is a material breach of the lease.  It also argues that, even if the Debtor is allowed to reject the lease, the Tenant is not subject to forfeiture and can remain in the property under §365(h).

The Court held evidentiary hearings on the motion on June 1, June 21 and July 7, 2011.  After the parties filed post-trial briefs, the Court heard closing arguments on August 29, 2011.  The parties ask the Court to resolve all of the §365(h) issues as follows: (1) should the Court approve the Debtor's rejection of the lease; (2) has the Tenant forfeited its §365(h) right to remain in the property after rejection because it breached the lease; and (3) if the Tenant can exercise its §365(h) rights, what is the scope of those rights?[2]

For the reasons set forth herein, the Court concludes that the Debtor may reject the lease.  The Court further concludes that the Tenant has not forfeited its §365(h) rights and may remain in possession of the leasehold property, and that the Debtor has intentionally and materially breached the lease.  The Court further concludes that Auto Showcase must vacate the property and allow the Tenant to use and enjoy it in accordance with the lease.

**Findings of Fact**

---

[1] All statutory references are to the United States Bankruptcy Code, 11 U.S.C. 101 *et seq.*, as currently in effect, unless otherwise indicated.

[2] In its post-trial brief, the Debtor argued that it can sell the property free and clear of the Tenant's interests under §363(f) even if the Court concludes the Tenant can remain in the leasehold property pursuant to §365.  The Court will address this latter issue as appropriate in conjunction with the pending motion to approve the proposed sale.

The Debtor filed a petition for chapter 11 relief on February 28, 2011. It owns the property known as 14107 Baltimore Avenue and 8307 Holly Street (also known as parcels 18, 19 and 20) in Laurel, Maryland (the "Premises"). The Premises consists of, among other things, a showroom and office space in a commercially zoned building and a parking lot suitable for the conduct and occupancy of an automobile dealership business.

Auto Showcase filed a petition for chapter 11 relief on March 29, 2009. It has operated a car dealership at the Premises at all times relevant to this proceeding. The Debtor's and Auto Showcase's bankruptcy cases are jointly administered.

The Debtor and Auto Showcase are 100% owned by Sandra and Allan Landsman. There was some confusion in the record as to the percentage ownership of Sandra and Allan Landsman, respectively. It appears that Sandra owns 51% and Allan owns 49%. In any event, Sandra Landsman manages both the Debtor and Auto Showcase. Allan Landsman is somewhat active in their operations but has experienced significant health issues over the past few years.

In managing the Debtor and Auto Showcase, Ms. Landsman regularly fails to make a meaningful distinction between the two entities, and that has led both debtors to file a joint motion for substantive consolidation. *See* Docket No. 292. In the consolidation motion, the Debtor and Auto Showcase aver that Ms. Landsman, as owner and controlling officer of each entity, does not follow corporate formalities. *See* Docket No. 292 at ¶9. Here, the rejection motion states that although the Debtor, not Auto Showcase, is the owner of the Premises, Auto Showcase "represents in the view of [the Debtor and Auto Showcase] a de facto co-owner of the [Premises] based on the parties

course of conduct and dealings as an entity subject to substantive consolidation."  Docket No. 313 at ¶10.

The Landsmans ran Auto Showcase for many years before moving to Florida, leaving their son Jayson in charge of operations.  According to the Debtor, Auto Showcase's operations deteriorated primarily as a result of curtailments in the credit facility by Auto Showcase's lender.  The reduction in the credit facility led to other problems.  As described by the Debtor, "Jayson Landsman's operation of the [Auto Showcase] business under these conditions led to difficult and unfortunate accounting irregularities in the completion of auto sale contracts, including duplicate title issuance and a failure to payoff existing liens."  Docket No. 376 at 8.  Thus, many customers who purchased vehicles from Auto Showcase could not obtain titles to the vehicle, and numerous customers who traded or sold their vehicles to Auto Showcase also had problems getting the existing liens cleared and loans paid off.  The number of such complaints exceeded seventy.  Sandra Landsman returned to operate Auto Showcase in an effort to work out these problems and stabilize its operations.

Jayson Landsman contacted Haris Hanifi ("Hanifi"), the principal of the Tenant, to determine if he had interest in acquiring the car dealership.  Hanifi initially resisted, but ultimately reached an agreement after negotiations with Sandra Landsman.  As a result, the Debtor and Tenant entered into the Lease and Option to Purchase Agreement (the "Lease") on or about March 12, 2010, pursuant to which the Debtor leased to the Tenant the Premises.  Lease at ¶1.

The initial term of the Lease ran from March 15, 2010 to March 14, 2011, at a monthly rent of $8,400.00.[3]  *Id*. at ¶¶3-4.  The Lease gave the Tenant the option to renew for one additional three-year term and two additional five-year terms at $10,000 per month.  *Id*. at ¶18A.  By letter dated February 8, 2011, the Tenant timely exercised its option to renew the Lease.

The Lease gave the Tenant the exclusive right to purchase the Premises for $1,800,000 until December 31, 2011.  *Id*. at ¶12.  The Tenant made a $50,000 payment in accordance with the Lease for the right to purchase.  *Id*. at ¶12A.  The fee was refundable on the terms and conditions set forth in the Lease.  *Id*.  The $50,000 fee is fully refundable–although technically not until February, 2011, *see id*.,–because the Tenant will not exercise the purchase option.

The Tenant operated a car dealership at a location in Temple Hills, Maryland.  It entered the Lease to open a car dealership at the Premises.  The Lease identified this purpose.  Lease at ¶5.

One of the Lease provisions that is at the core of the parties' disputes is Paragraph 22.  It provides:

> 22. <u>Landlords Use</u>.  Landlord may, at its option, use and occupy its present two offices in the rear of the [Premises] during the first six (6) month of the Term of the [Lease], free of any charges, rent or rent reduction to tenant.

Lease at ¶22.  At the time the parties executed the Lease, Hanifi knew that Auto Showcase operated its business from the Premises.  He also knew that the Landsmans owned both the Premises and the car dealership.  Sandra Landsman told Hanifi she

---

[3] The parties also entered into a Supplemental Agreement dated as of March 23, 2010 (the "Supplemental Agreement") in which the Tenant agreed to pay the Debtor an additional $3,250 in monthly rent through February 15, 2011.  Exh. 2.  The Court will treat the Supplemental Agreement as part of the Lease.

needed a few months to wind down Auto Showcase's business. She asked if Hanifi would mind if she occupied the two back offices to do so, and asked for six months to be on the safe side. Hanifi understood Paragraph 22 of the Lease to mean that Auto Showcase would vacate the Premises in six months (*i.e.*, September 15, 2010) and that he would have full use and enjoyment of the Premises after that.

The Tenant moved into the Premises and paid rent according to the Lease and Supplemental Agreement for the first six months, through and including the September 15, 2010 payment. The Tenant made a number of improvements to the Premises, such as painting the walls and installing an air-conditioning unit. The Tenant also obtained an $800,000 increase on its floor plan line-of-credit to handle the anticipated sales volume, and basically did the things necessary to open a car dealership there.

Auto Showcase did not vacate the Premises on September 15, 2010, and still has not done so today. As long as Auto Showcase occupies the Premises and is licensed to sell cars there by the Maryland Department of Motor Vehicles, the Tenant cannot obtain a license to sell cars there under Maryland regulations. After Auto Showcase failed to vacate the Premises, the Tenant stopped paying rent, claiming the Debtor's failure to vacate the Premises was a material breach of the Lease that prevented the Tenant from using the Premises for the purpose intended under the Lease.

In the meantime, the Tenant determined it would not exercise the option to purchase the Premises in accordance with the Lease. Sandra Landsman did not fully appreciate that the Tenant could continue to occupy the Premises under the Lease if it did not intend to purchase the Premises. In her view, the Tenant's occupancy of the Premises was intended to be temporary pending the sale. She did not anticipate that the Tenant

6

would stay in the Premises as a long-term tenant if it did not exercise the purchase option. Nothing in the Lease supports this view or links the Tenant's right to possession with a requirement that it exercise the option to purchase the Premises.

As a result of the Debtor's and Auto Showcase's failure to vacate the back two rooms, the Tenant and Auto Showcase continue to co-exist at the Premises–albeit barely. The relationship between the Landsmans, on behalf of the Debtor and Auto Showcase, and Hanifi and his employees, on behalf of the Tenant, has become completely dysfunctional–to use the word most often used to describe it at trial. In this regard, the Court will make further findings as necessary in the Conclusions of Law; it is sufficient here to state that the evidence of the aggressive, retaliatory behavior between the parties was not only appalling, but potentially harmful and dangerous. This included: physical confrontations and threats of physical violence; numerous calls for police assistance; swearing; preventing people from using rest rooms so they soiled themselves; driving a car into a glass doorway; breaking into the other party's space; padlocking doors; heckling and harassing the other's customers; allegations of assault with a motor vehicle; the need for restraining orders; disconnecting phone service; blocking the entranceway to the parking lot; and the like.

On February 24, 2011, Tenant filed a five-count complaint against the Debtor in the Circuit Court for Prince George's County, Maryland alleging breach of contract, violation of the covenant of quiet enjoyment and fraud. The Tenant sought protection of its possessory interest in the Premises, including an order requiring the Debtor to vacate the Premises. The Debtor filed its chapter 11 petition four days later.

On May 31, 2011, the Debtor, along with Auto Showcase, filed a joint motion to sell the Premises free and clear of liens for a purchase price of $1,100,000 to Lou Cohen, a friend of the Landsmans. According to the Debtor, prior to the petition date, Mr. Cohen loaned the Debtor $100,000 and holds a lien on the Premises. He signed a letter of intent for the purchase of the Premises for $1,100,000, which includes a credit bid for the previous $100,000 loan. The Debtor states that Mr. Cohen will lease the Premises to Auto Showcase and also will provide $400,000 of financing to Auto Showcase that will allow it to continue its car dealership operations there. The transaction with Mr. Cohen is subject to an order from this Court authorizing the rejection of the Lease and terminating the Tenant's rights under §365(h). The Debtor filed an amended motion to sell on August 27, 2011, which substituted a contract of sale between the Debtor and Mr. Cohen for the letter of intent.

In 2006, the Debtor and Auto Showcase entered into a ten year lease (the "Auto Showcase Lease") for the Premises at an initial monthly rate of $5,600. Auto Showcase has not paid rent to the Debtor since 2008. The Debtor did not disclose the existence of the Auto Showcase Lease to the Tenant prior to entering into the Lease. Hanifi did not know of its existence before he executed the Lease. The Debtor and Auto Showcase have described the lease as "theoretical":

> 9. ASC is a tenant of S&A under a lease agreement as to the Property which existed prior to the First Petition Date; however, this landlord tenant relationship exists in theory only inasmuch as Sandra Landsman is the owner and controlling officer/member of both ASC and S&A. Indeed, no rent has been paid by ASC to S&A and no rent is expected to be paid under the theoretical lease agreement. This is because ASC and S&A act collectively as the real owners in interest of the Property given the common ownership of the Debtors by Sandra Landsman. In actuality, ASC

and S&A are not debtor/creditor of each other, but rather each is the alter ego of the other.[4]

Docket No. 292 at ¶9.

The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§1334, 157(a) and Local Rule 402 of the United States District Court of the District of Maryland. This is a core proceeding pursuant to 28 U.S.C. §§157(b)(2)(A) & (O).

## Conclusions of Law

*Lease Rejection and §365(h).*

The motion is brought under §365(a), which allows a debtor, subject to court approval, "to assume or reject an executory contract or unexpired lease . . . ." Section 365(a) applies here because the Lease is an unexpired lease of real property.

The standards that govern lease rejection are well established. A debtor may reject an executory contract if it is advantageous to the debtor to do so. *Lubrizol Enterprises, Inc. v. Richmond Metal Finishers, Inc.*, 756 F.2d 1043, 1046 (4th Cir. 1985). Courts accord a debtor's decision to reject an executory contract or lease the same deference that is generally applied to the decisions of corporate directors under the business judgment rule. *Id.* Courts should not interfere with the sound business judgment of corporate directors, unless there is a finding of bad faith or gross abuse of their business discretion. *Id.* at 1047. Bankruptcy courts will defer to the business discretion of the debtor to reject an executory contract or lease, unless it is shown that the debtor's motive to reject is in bad faith or in gross abuse of the debtor's retained business

---

[4] The Court can take judicial notice of the consent motion for substantive consolidation filed in Case No. 09-14731 (Docket No. 292). The Court entered a consent order for joint administration of the cases, which also stated that the Debtor and Auto Showcase agreed to defer any substantive consolidation issues to the adversary proceeding at a later time and in conjunction with any plan that is later filed. Both the Debtor and Auto Showcase filed an adversary proceeding seeking declaratory judgment regarding substantive consolidation. Adversary Proceeding No. 11-154, Docket No. 1. However, the complaint was withdrawn by the Debtor and Auto Showcase on June 21, 2011. *Id.* at Docket No. 7.

discretion.  *Id.*  Specifically, once the debtor has decided that rejection will be beneficial to the estate pursuant to §365(a), the issue presented to the bankruptcy court is

> whether the decision of the debtor that rejection will be advantageous is so manifestly unreasonable that it could not be based on sound business judgment, but only on bad faith, or whim or caprice. That issue is one of fact to be decided as such by the bankruptcy court by the normal processes of fact adjudication.

*Id.*

Notwithstanding this deferential standard, the question here is not free from doubt.  This is because the evidence established that, in exercising her business judgment, Sandra Landsman makes all decisions regarding the Debtor by reference to what is in the best interest of both Debtor and Auto Showcase, collectively.  Indeed, she seldom distinguishes between the two.  As she stated, she wears two hats, one for each debtor. While this decision-making process may result in a decision that is in the best interests of the Debtor and Auto Showcase together, it does not necessarily lead to a decision that is based on sound business judgment by reference to the Debtor alone.  The subject dispute may be one such instance:  An independent fiduciary of the Debtor might well determine that allowing Auto Showcase to remain in the Premises rent free, to the total disruption of the tenancy of the Tenant, is not in the best interest of the Debtor.

Nevertheless, the Court will approve the rejection of the Lease.  The evidence established that the Debtor no longer wishes–if it ever did–to be a long-term third party landlord.  It desires to take its chances obtaining approval of the proposed sale transaction with Mr. Cohen.  Further, the situation at the Premises is untenable, with Auto Showcase and the Tenant proverbially at each other's throats.  The Court does not conclude this *decision* is based on "bad faith, or whim or caprice," *id.*, and therefore approves the

Lease rejection.  The Court will address the Debtor's and Auto Showcase's *actions* in the

context of the discussion of the Tenant's §365(h) rights.

Where a debtor rejects an unexpired lease of real property under which the debtor

is the lessor, §365(h) applies.[5]  As pertinent here, the Tenant may retain its rights under

the Lease for the balance of the Lease term and for any renewal of it "to the extent such

rights are enforceable under applicable nonbankruptcy law."  *Id*.  The Debtor contends

that the Tenant has breached the Lease, and under Maryland law (*i.e.*, the "applicable

nonbankruptcy law") the Debtor has forfeited its right to remain in possession.  The

---

[5] Section 365(h) provides:

> (h)(1)(A) If the trustee rejects an unexpired lease of real property under which the debtor is the lessor and—

>> (i) if the rejection by the trustee amounts to such a breach as would entitle the lessee to treat such lease as terminated by virtue of its terms, applicable nonbankruptcy law, or any agreement made by the lessee, then the lessee under such lease may treat such lease as terminated by the rejection; or

>> (ii) if the term of such lease has commenced, the lessee may retain its rights under such lease (including rights such as those relating to the amount and timing of payment of rent and other amounts payable by the lessee and any right of use, possession, quiet enjoyment, subletting, assignment, or hypothecation) that are in or appurtenant to the real property for the balance of the term of such lease and for any renewal or extension of such rights to the extent that such rights are enforceable under applicable nonbankruptcy law.

> (B) If the lessee retains its rights under subparagraph (A)(ii), the lessee may offset against the rent reserved under such lease for the balance of the term after the date of the rejection of such lease and for the term of any renewal or extension of such lease, the value of any damage caused by the nonperformance after the date of such rejection, of any obligation of the debtor under such lease, but the lessee shall not have any other right against the estate or the debtor on account of any damage occurring after such date caused by such nonperformance.

> (C) The rejection of a lease of real property in a shopping center with respect to which the lessee elects to retain its rights under subparagraph (A)(ii) does not affect the enforceability under applicable nonbankruptcy law of any provision in the lease pertaining to radius, location, use, exclusivity, or tenant mix or balance.

> (D) In this paragraph, "lessee" includes any successor, assign, or mortgagee permitted under the terms of such lease.

11

Tenant counters that it is the Debtor, not it, that has breached the Lease.  The Court now turns to the parties' allegations.

*The Tenant's Redemption Rights.*

The Debtor first contends that the Tenant's failure to pay rent after September, 2010 is a material breach of the Lease, and because the Lease specifically waives the Tenant's right of redemption, the breach cannot be cured.  The Tenant responds that its failure to pay rent was justified in light of the Debtor's breach and disputes that it waived its right of redemption.

Turning first to the question of whether the Tenant waived its redemption rights, Maryland law provides a tenant with redemption rights even when it has defaulted on its rent obligations.  Under Md. Code Ann., Real Prop. §8-401(e)(1), "in any action of summary ejectment for failure to pay rent where the landlord is awarded a judgment giving the landlord restitution of the leased premises, the tenant shall have the right to redemption of the leased premises by tendering . . . all past due amounts, as determined by the court . . . ."

The Debtor argues that the Tenant waived its redemption rights in the Lease.  This Court disagrees.  Paragraph 29(c) of the Lease provides:

> (c) <u>Waiver of Redemption</u>.  Tenant hereby expressly waives, for itself and all persons claiming by, through, or under it, any right of redemption or for the restoration of the operation of this Agreement under any present or future law <u>in case Tenant shall be dispossessed for any cause, or in case Landlord shall obtain possession of the Premises as herein provided.</u>

Lease at ¶29(c) (emphasis added).  Thus, the waiver applies only where the Tenant has been dispossessed or the Debtor has taken possession.  By implication, there is no waiver

where those events have not occurred. Since they have not occurred here, the Tenant did not waive its right of redemption.[6]

Hanifi testified that the Tenant is able and willing to pay all accrued rent if required by the Court, and the Court accepts this testimony. The Tenant requests, however, that before the Court orders it to pay all accrued rent, it should first adjudicate the Tenant's damages claims against the Debtor, which the Tenant contends far exceed the accrued rent. The Tenant also requests the Court to order the Debtor and Auto Showcase to vacate the Premises, and states it will commence paying rent when it obtains full use and enjoyment of the Premises. In any event, however, the Tenant is prepared to pay all accrued rent if ordered by the Court.

The Court will not require the Tenant to pay the accrued rent at this time. Technically speaking, there is no action of ejectment pending, and the matter before the Court is whether the Tenant's possessory and other rights remain enforceable under state law. Thus, the Court has more leeway in this regard than perhaps would a state court in an ejectment action. Even if that were not the case, at most the Court would require the Tenant to pay the accrued rent into escrow considering both the Debtor's precarious financial condition and the Tenant's substantial claims against the Debtor, as discussed further herein. Moreover, the Debtor has received the Tenant's $50,000 deposit for the option to purchase and, given that the Tenant will not exercise the option, all conditions have occurred for the return of the deposit except the passage of time. *See* Lease at

---

[6] Even if this Court were to find that the Tenant waived its redemption rights, "[f]orfeiture of leases are not favored under Maryland law, and a Maryland court may grant equitable relief from a lease forfeiture where circumstances warrant." *In re Opus Corp.*, 89 B.R. 9, 10 (Bankr. D.Md. 1988) (Derby, J.). For a tenant to be eligible for equitable relief and avoid forfeiture of the lease for failure to pay rent, the tenant must cure all defaults. *Id.* at 11-12.

¶12A.  And even the Debtor agrees the deposit can now be applied in the claims process.[7]

The deposit would reduce any obligation for the accrued rent by $50,000.

However, having considered the parties' mutual breach claims as discussed

further herein, the Court concludes that the more appropriate approach here is to resolve

those claims before determining the proper timing for their payment.[8]  The Court now

turns to those issues.

*The Debtor's Material Breach.*

The Tenant contends the Debtor materially breached the Lease by failing to

require Auto Showcase to vacate the Premises after six months.  It also contends that

Auto Showcase's occupancy and the attendant dysfunctional behavior violated the

covenant of quiet enjoyment set forth in Paragraph 25 of the Lease.  It contends it

stopped paying rent as a justifiable response to Debtor's breaches.  The Debtor disputes it

has breached either Paragraph 22 or 25.

The Court will first address whether the Debtor breached the Lease by failing to

require Auto Showcase to vacate the Premises after six months.  The meaning of

Paragraph 22 is at the core of the parties' dispute.  In determining whether a contract is

ambiguous, Maryland has long adhered to the law of the objective interpretation of

contracts.  *Calomiris v. Woods*, 727 A.2d 358, 363 (Md. 1999).  Under the objective

view, a written contract is ambiguous if, when read by a reasonably prudent person, it is

subject to more than one interpretation.  *Id.; Sy-Lene of Washington Inc. v. Starwood*

*Urban Retail II, LLC*, 829 A.2d 540, 546 (Md. 2003); *Heat & Power Corp. v. Air*

---

[7] *See* Docket No. 376 at p. 40 ("Given that the Tenant made it clear at the trial that it does not wish to exercise a $1,800,000 offer to purchase the Real Property, there is no serious purpose in delaying the setoff of the $50,000 . . . .").
[8] Because of this conclusion, the Court need not address the parties' arguments concerning rent abatement.

*Products & Chemicals, Inc.* 578 A.2d 1202, 1208 (Md. 1990); *Truck Ins. Exch.v. Marks*

*Rentals, Inc.,* 418 A.2d 1187, 1190 (Md. 1980).  "The determination of whether language

is susceptible of more than one meaning includes a consideration of 'the character of the

contract, its purpose, and the facts and circumstances of the parties at the time of

execution."  *Calomiris*, 727 A.2d at 363 (quoting *Pacific Indem. v. Interstate Fire &*

*Cas.,* 488 A.2d 486, 488 (1985)).

     The Maryland Court of Appeals in *Calomiris* further held that the court's task

when interpreting a contract is to:

> [D]etermine from the language of the agreement itself what a
> reasonable person in the position of the parties would have meant at
> the time it was effectuated. In addition, when the language of the
> contract is plain and unambiguous there is no room for construction,
> and a court must presume that the parties meant what they
> expressed. In these circumstances, the true test of what is meant is
> not what the parties to the contract intended it to mean, but what a
> reasonable person in the position of the parties would have thought
> it meant. Consequently, the clear and unambiguous language of an
> agreement will not give away to what the parties thought that the
> agreement meant or intended it to mean.

*Calomiris*, 727 A.2d at 363 (citations omitted) (internal quotation marks omitted).

     The Tenant contends Paragraph 22 means that the Debtor and Auto Showcase

would move out of the Premises after six months, and thus would stop selling cars there.

The six month period would allow Sandra Landsman to wind down the operations of

Auto Showcase.  The Tenant would be able to obtain a license to sell cars and conduct its

business at the Premises.  This was crucial to the Tenant, because, aside from the initial

six months of the Lease term, it would not have agreed to pay rent at the Premises unless

it could use the Premises for the purpose for which it entered the Lease: to sell cars there

to pay the rent.

The Debtor's purported understanding of the overall purpose of the Lease colored its view of each provision. Sandra Landsman testified that she believed the Lease was a short-term transaction and that the Tenant would buy the Premises in six months or so when it obtained certain zoning approvals. It appears she did not fully consider what would happen if the Tenant decided against exercising the purchase option and did not anticipate that the Tenant would stay in the Premises as a tenant for the full term of the Lease in such a case. She does not want the Tenant to remain in possession under the Lease after having decided not to buy the Premises or to have Auto Showcase vacate. Indeed, the Debtor's understanding of the Lease is described in its post-trial filing as follows:

> The purpose of the Lease . . . was to permit [the Tenant] to have a brief period of time to purchase the Property such that the monies could be used to fund the reorganization of [Auto Showcase] and pay down some of [the Debtor's] indebtedness.

Docket No. 376 at 10.

This fundamental misunderstanding of the express terms of the Lease is the genesis of the disputes between the parties. Nothing in the Lease conditions the Tenant's right to use and occupy the Premises with a requirement that it exercise the option to purchase. The Tenant's decision not to exercise the purchase option does not alter or limits its right to occupy the Premises. The Lease is clear and unambiguous on this point. The Debtor suggests the Tenant pulled a fast one by drafting a Lease that did not reflect the agreement between the parties. The record does not support this contention. The Lease provisions addressing the Lease term and the Tenant's renewal rights are clear and

unambiguous.  Two lawyers reviewed the Lease on behalf of the Debtor.  A simple reading reveals these terms.[9]

To be sure, Paragraph 22 refers to the "Landlord's" use of the two back offices, thus potentially distinguishing between the Debtor and Auto Showcase.  But the facts establish that the parties understood that Paragraph 22 applied to Auto Showcase at the time they entered the Lease.  There is no dispute that Auto Showcase occupied the Premises at that time.  And there is no dispute that, subsequent to the Lease execution, it was Auto Showcase that occupied the back two offices in an effort to sell cars there.  The Lease simply did not make a bright line distinction between Auto Showcase and the Debtor.  For example, Paragraph 19 of the Lease refers to "the Landlord's Bankruptcy Case pending in the United States Bankruptcy Court for the District of Maryland."  But at that time Auto Showcase, and not the Debtor, was the subject of a bankruptcy case.

Both the Debtor and the Tenant failed to distinguish between the Debtor and Auto Showcase.  Hanifi testified that he viewed the Debtor, Auto Showcase and the Landsmans as one and the same.  Sandra Landsman regularly made decisions without regard to the distinction between the two entities.  On this point, the Court need look no further than the rejection motion itself, in which the Debtor and Auto Showcase state that Auto Showcase "represents in the view of [the Debtor and Auto Showcase] a de facto co-

---

[9] As another purported explanation of Paragraph 22, at trial Debtor argued that Paragraph 22 could mean that, after six months, Auto Showcase could continue to stay in the Premises but would just be required to pay rent.  This interpretation was not supported by testimony from Sandra Landsman and is unreasonable.  First, Auto Showcase already had an obligation to pay rent, which it had ignored for two years before the Lease was signed.  Second, a prospective tenant would not care whether the landlord's affiliate paid the landlord rent–the prospective tenant would be concerned with whether it could use the leasehold for the intended purpose.

owner of the [Premises] based on the parties course of conduct and dealings as an entity subject to substantive consolidation."[10]  Docket No. 313 at ¶10.

Taking into account the "the character of the contract, its purpose, and the facts and circumstances of the parties at the time of execution," *Calomiris*, 727 A.2d at 363, the Court concludes that the Lease is unambiguous and that the Tenant's understanding of the Lease is the only reasonable interpretation.  At the time the parties entered into the Lease, Auto Showcase was selling cars there.  The Tenant entered into the Lease to operate a car dealership at the Premises.  It needed Auto Showcase to vacate the Premises because it could not obtain a license to sell cars there as long as Auto Showcase occupied the Premises.  And it did not anticipate or expect that it would have to compete with another car dealership in the same space.

Moreover, this interpretation is consistent with the parties' discussions prior to entering the Lease.  At that time, the operations of Auto Showcase were in disarray. Sandra Landsman told Hanifi that she needed a few months to wrap up its operations and asked to use the two back offices for that purpose.  She may well have said this anticipating the Tenant's purchase, but nevertheless that was the basis for the provision. The parties agreed to a six month period.  No other interpretation is reasonably consistent with the context in which the parties entered into the Lease and its express language.

In any event, the issue of whether the Lease is ambiguous arose during witness examinations.  The Court allowed testimony by both parties concerning the purpose and intention of the Lease provisions, subject to its later determination of the issue.  Having heard that testimony, the Court would reach the same conclusions even if it were to determine the Lease is ambiguous.

---

[10]  *See* supra Findings of Fact.

The Court therefore concludes that the Debtor materially breached the Lease by failing to vacate, and failing to have Auto Showcase vacate, the Premises after six months.  The Debtor's breach has directly caused the failure of the Tenant to realize the benefit of its bargain in the Lease.  The breach was intentional–the Debtor knew that Auto Showcase was not vacating the Premises and that the Tenant could not sell cars there as a result.  The breach went to the heart of the Tenant's purpose for entering into the Lease–the Tenant was obligated to pay rent but could not engage in the very business for which it entered the Lease and from which it intended to generate revenue to pay the rent due under the Lease.

Moreover, no later than once it appeared that the Tenant would not exercise the purchase option in the Lease, the Debtor's breach was a bad faith effort to force the Tenant to move.  Because the Landsmans viewed the Lease as a short-term bridge transaction pending a sale to the Tenant, they had no willingness to allow the Tenant to remain under the Lease without a sale.  Neither the Debtor nor Auto Showcase had a legitimate basis to remain in the Premises after six months under the Lease.  Considering the 100% overlap in ownership, the Landsmans were not going to require Auto Showcase to vacate the Premises and have the Debtor be a third party landlord over the long term.  Thus, Auto Showcase refused to vacate to allow the Tenant to use peacefully the Premises.  And the Debtor and Auto Showcase have gone to great lengths, which continue today, to disrupt the Tenant's possession.  To be sure, the Tenant has not hesitated to respond aggressively and in kind, and emotions have taken over on both sides.  But the primary cause of the animus between the parties is Auto Showcase's

refusal to vacate the Premises and the Debtor's and Auto Showcase's desire to strip the Tenant of its right to possession.

The Court also concludes that these actions by the Debtor constitute a breach of the covenant of quiet enjoyment at Paragraph 25. That provision grants the Tenant the right to "quietly hold, occupy and enjoy the Premises . . . without hindrance, ejection or molestation by Landlord or any party claiming through or under Landlord . . . ." Lease at ¶25.

Despite the Debtor's and Auto Showcase's efforts, the Tenant remained in possession of the Premises, including to the present day. Under the circumstances, the Tenant could have pursued a claim for constructive eviction, vacated and requested damages. Similarly, now upon rejection, the Tenant can treat the Lease as terminated, sue for rejection damages, and vacate. However, the Tenant desires to remain in possession, free from the Debtor's and Auto Showcase's interference, and assert its claims for breach.

While the parties have not cited a case addressing the remedies available when a landlord's breach negated a tenant's ability to use the leasehold for its intended business purpose and also constituted a breach of the covenant of quiet enjoyment, certain principles are applicable by analogy. In Maryland, each party to a lease has a right to bring an action for breach of the contractual provisions of the lease and to recover damages. *See, generally, Matisoff v. Vecchio*, 258 A.2d. 168 (Md. 1969). A landlord's breach may be both a contractual breach and a tortious injury. "It is well settled in this State that a covenant in a lease to the effect that the tenant shall have the *exclusive* right of conducting a specified business on the leased premises may be injunctively enforced

20

against . . . the landlord . . . ." *Freedman v. Seidler (Freedman)*, 194 A.2d 778, 781 (Md. 1963) (internal citation omitted).  If the landlord continually trespasses or interferes with the tenant, the lessee may seek injunctive relief to restrain continued trespass or other interference and damages.  *Id*.  Likewise, an injured tenant may sue a landlord who has breached a covenant pledging no competition.  *Id.* at 782 (citation omitted).  An equity court can issue an injunction against a party to protect the right of a lessee's interest in the quiet enjoyment of the leasehold when the lessee would otherwise be required to resort to action in ejectment or in tort.  *Baltimore Butchers Abattoir & Live Stock Co.* v. *Union Rendering Co. (Baltimore Butchers)*, 17 A.2d 130, 132 (Md. 1941).

In *Freedman*, the lease included a restrictive covenant that the landlord would not lease other property owned by the landlord on the same street to a party that could conduct business in direct competition with the tenant.  Notwithstanding the covenant, the landlord entered into a lease agreement with a direct competitor of the tenant.  The lower court awarded damages to the tenant based on the tenant's lost profits.  On appeal, the Court of Appeals upheld the general rule that an injured tenant may sue a landlord who has breached a covenant pledging no competition and concluded that lost profits was an appropriate measure of damages.  *Freedman* at 782.  However, the Court did not permit the tenant to recover the legal and accounting costs as damages because under the general rule costs and expenses are not recoverable in an action for breach of contract in the absence of statutory authority or special circumstances.[11]

This case applies by analogy.  The Debtor's agreement to vacate the Premises after six months was necessary to allow the Tenant to sell cars there.  The failure to

---

[11]  Notably, the Court did not explain the term "special circumstances."  The factual record of the case did not discuss whether the lease contained a provision for attorney's fees.

vacate prevents the Tenant from doing so.  By allowing Auto Showcase to occupy the Premises and conduct business there, the Debtor is harming the Tenant's business and causing it a loss.  The Tenant has a claim for breach of the Lease.

In determining the amount of the claim, the Court will begin by determining the amount of unpaid rent that has accrued under the Lease.  The parties are in agreement that the Tenant was current through the September 15, 2010 payment.  The monthly Lease rent was $8,400 through and including the February 15, 2011 payment.  Lease at ¶4.  Thereafter, the monthly rent increased to $10,000 if the tenant exercised the option to renew.  *Id.* at ¶¶4, 18A.  Under the Supplemental Agreement, the additional rent was $3,250 from the October 15, 2010 payment through and including the February 15, 2011 payment, after which there was no further rent obligation.  For purposes of this decision, leaving aside for the moment any distinction between pre- and post-petition rent and the $50,000 deposit, the total amount of rent accrued under the terms of the Lease and the Supplemental Agreement through August 15, 2011 is $108,250, follows:

| Rent Payment Due | Rent under the Lease | Rent under the Supplemental Agreement | Total Rent Accrued |
|---|---|---|---|
| October 15, 2010 | $8,400 | $3,250 | |
| November 15, 2010 | $8,400 | $3,250 | |
| December 15, 2010 | $8,400 | $3,250 | |
| January 15, 2011 | $8,400 | $3,250 | |
| February 15, 2011 | $8,400 | $3,250 | |
| March 15, 2011 | $10,000 | | |
| April15, 2011 | $10,000 | | |
| May 15, 2011 | $10,000 | | |
| June 15, 2011 | $10,000 | | |
| July 15, 2011 | $10,000 | | |
| **TOTAL** | **$92,000** | **$16,250** | **$108,250** |

The Debtor filed its petition on February 28, 2011.  To determine the pre-petition and post-petition accrued amounts for purposes of this decision, the February 15, 2011 payment will be allocated 50% to pre-petition ($4,200 + $1,625) and 50% to post-petition ($4,200 + $1,625).  Thus, the pre-petition accrued rent is estimated at $52,425 and the post-petition accrued rent is estimated at $55,825 through and including the payment due for July 15, 2011.

Turning to the Tenant's damage claim, Hanifi testified that the Tenant had pre-petition damages of $156,917 and post-petition damages through May, 2011 of $106,267.  These damages represent expenses incurred and lost sales.  He also testified that the Tenant has expended substantial amounts in legal fees, upwards of $50,000.  Under the Lease, the Debtor specifically indemnified the Tenant "from and against any and all claims that . . . (ii) arise from or are in connection with any act or omission of [Debtor] or [Debtor's] agents, employees or invitees."  Lease at ¶19.  Thus, unlike *Freedman*, this broad provision appears to grant the Tenant a claim for attorney's fees in the event of an "any act or omission" by the Debtor.

However, Hanifi's testimony, while essentially uncontroverted, was conclusory and not supported by documentary evidence.  The Court is hesitant to establish the amount of the Tenant's damage award on this record, especially since the precise amount of the award is not necessary for the purposes of resolving the motion.  Moreover, there is at least some question as to when the Tenant could have begun selling cars, given the timing of the zoning change necessary for the Tenant to obtain a use and occupancy certificate.  It is enough here that the Court concludes that (1) the Tenant has a sizable claim for the Debtor's material, bad faith breach of the Lease; and (2) it appears from the

record that the Tenant's claim substantially exceeds the amount of unpaid rent on both a pre-petition and post-petition basis, especially taking into account the $50,000 purchase option deposit. The Court will defer the final determination of damages to further proceedings.

In sum, the Court concludes that the Debtor has materially breached the Lease, and the Tenant has not forfeited its right of possession by failing to pay rent after the September 15, 2010 payment. However, the Debtor raises a number of other alleged breaches of the Lease by the Tenant in an effort to cause the Court to conclude that the Tenant has lost the right to remain in possession under §365(h) rights. The Court will address these allegations next.

*The Alleged "Finalization" Breach.*

The Debtor contends that the Tenant breached the Lease by finalizing car sales at the Premises. This contention fails.

The Lease provides:

> The Tenant is permitted to locate and show automobiles for sale on the Premises but any sale of any such automobile has to be finalized at Tenant's Temple Hills address in accordance with Tenant's current MVA-issued Automobile Dealer's License; and following the final non-appealable approval of the zoning application referenced in Paragraph 6 below, the Tenant may use the Premises for the conduct of a lawful automobile dealership business with its own MVA-issued Automobile Dealer's License for the Premises.

Lease at ¶1. The parties disputed what the term "finalized" means in Paragraph 1. Sandra Landsman testified that a sale is "finalized" when a temporary tag is placed on the vehicle and the prospective purchaser takes it home, even if the transaction is subject to bank financing. The Debtor contends that the Tenant finalized sales in this fashion in

24

contravention of the Lease.  But Sandra Landsman's testimony was belied by statements made on her behalf in litigation in Florida state court.  *See* Tenant's Exh. 35.  Thus, the Debtor did not establish, by a preponderance of the evidence, that the Tenant "finalized" car sales at the Premises as that term is used in the Lease.

Moreover, the Court concludes that even if the Tenant finalized car sales in contravention of the Lease, that would not justify a termination of the Tenant's rights under §365(h).  The case of *Baltimore Butchers*, 17 A.2d 130, is instructive.  There, the Court of Appeals affirmed the lower court's decision to enjoin the landlord from cutting off a necessary utility.  The landlord complained that the tenant violated the terms of the lease by using the leased premises for the manufacturing of animal feed in contravention of the specific language of the lease.  In the lease, "the tenant covenanted that it would not use the premises for 'the purposes other than those of a rendering (fertilizer) factory and for the storage of hides.'"  *Id.* at 131.  Approximately, two years after the lease was signed, the tenant began manufacturing feed under a different trade-name.  The landlord requested that the tenant stop the production of feed, but the tenant refused and the landlord threatened to stop the supply of steam to the factory.  The tenant needed the supply of steam to continue both its business.

Upon request of the tenant, the lower court issued an injunction, which was affirmed by the Court of Appeals.  The Court of Appeals addressed whether the manufacture of feed was contrary to the purposes of the lease, and therefore a breach of the lease permitting the landlord to re-enter.  The Court held that the use of the premises by the tenant for the manufacture of feed was not such a change of purposes that it constituted a breach of the instrument entitling the landlord to re-enter (discontinuing

steam supply).   In making this holding, the Court of Appeals examined the factual circumstances leading to the creation of the lease and found that the draftsmen of the lease knew that the factory would be used for rendering of animal meats.

Here, the Tenant's actions primarily were in response to the situation it found itself in–saddled with a Lease of a car dealership and no ability to sell cars because of the Debtor's breach.  It therefore sought to push the process of selling cars as far as it could to make the best of it.  The Debtor should not be relieved of its breach consequences if, as the Debtor alleges, the Tenant crossed the line of "finalization."  Moreover, there was no evidence that, even if the Tenant finalized sales at the Premises, that action caused the Debtor any harm or damages.  Finally, the very purpose of the Lease is to allow the Tenant to sell cars and operate a dealership at the Premises.  Thus, the Tenant's sales activities were entirely consistent with the purpose of the Lease and resulted in little consequences to the Debtor.

*The Tenant's Alleged Breach Concerning Zoning Violations.*

Similarly, the Tenant has not breached the Lease as a result of any zoning violations.  At the time the parties entered into the Lease, Auto Showcase did not have a use and occupancy certificate to operate a used car dealership.  The Debtor needed a zoning change for Auto Showcase or the Tenant to be able to obtain the use and occupancy certificate.[12]  Under Maryland law, only the party that holds the use and

---

[12]  As explained by the Board of Appeals for Prince George's County, Maryland, dated October 7, 2009:
> 4.  In 2000, Council Bill 87-2000 . . . was enacted to require that commercially-zoned lots used for the sale of used vehicles contain a minimum of 25,000 square feet of land . . . .
> 5.  Counsel for Petition explained that Ms. Landsman began operating her business, Auto Showcase, in September 1999 with the intention of purchasing S & A Realty, and since 2006 has owned both Auto Showcase and S & A Realty. Counsel explained that a change in ownership triggered the need to meet the current 25,000 square feet net lot requirement.

occupancy certificate can obtain a license to operate a car dealership, and not more than one license can be given to operate a car dealership at any one location.

Sandra Landsman anticipated that the zoning change would be accomplished in six months.  The zoning change would pave the way for the Tenant to obtain a use and occupancy certificate and purchase the premises.  Ultimately, the zoning change was approved and Auto Showcase received the use and occupancy certificate.  However, the Tenant cannot obtain a use and occupancy certificate because Auto Showcase holds it.  The Tenant cannot obtain the license to operate a car dealership at the Premises because Auto Showcase holds a license to do so.

The Debtor's contention that the Tenant is violating zoning restrictions fails.  Here again, the Debtor's and Auto Showcase's failure to vacate the Premises is causing the disruption to the Tenant's rights.  Any purported zoning violation would result from the Debtor's and Auto Showcase's failure to vacate so as to allow the Tenant to obtain the necessary approvals to operate a car dealership at the premises.  The rationale of *Baltimore Butchers* applies here as well.

*The Debtor's Co-Tenancy Theory.*

The Debtor contends that the Tenant and Auto Showcase are co-tenants, because each has a lease on the Premises.  According to the Debtor, Hanifi knew Auto Showcase operated its business there and so he entered the Lease with knowledge of Auto Showcase's occupancy.  Therefore, according to the Debtor, Hanifi should have assumed Auto Showcase had a lease for the Premises.  The Debtor contends that Auto Showcase

---

*****

    10. . . . when the Code changes and there is new ownership, a new tenant or a chage of use, the County requires compliance with current regulations.

Tenant's Exh. 24.

had every right to stay in the Premises even after six months under the Auto Showcase Lease. This contention has no merit.

There is no question that both the Lease and the Auto Showcase Lease were for 14107 Baltimore Avenue. Lease at ¶1; Auto Showcase Lease at 1. The only exception in the Lease was Paragraph 22, as the provision of quiet enjoyment made clear:

> 25. <u>Quiet Enjoyment</u>. Landlord covenants that Tenant, upon paying the Rent provided for in this Agreement, and upon performing and observing all of the terms, covenants, conditions, and provisions of this Agreement on Tenant's part to be kept, observed and performed, shall quietly hold, occupy and enjoy the Premises during the term of this Agreement without hindrance, ejection or molestation by Landlord or any party claiming through or under Landlord, <u>except for Landlord's right to use and have the same rights of quiet enjoyment to the reserved portions of the Premises under Paragraph 22.</u>

Lease at ¶25 (emphasis added). Simply put, a landlord cannot lease the same property to two different tenants without the knowledge and consent of both, especially two tenants that are in the same business.

If the Court were to conclude that this contention was anything other than an ill-founded litigation tactic, it would also conclude that the Debtor committed fraud by failing to disclose the Auto Showcase Lease when it leased the Premises to the Tenant.[13] However, the Court does not conclude that the Debtor committed fraud. Rather, the Court finds that Ms. Landsman simply disregarded the Auto Showcase Lease when she entered the Lease on behalf of the Debtor. Sandra Landsman may not have taken formal steps to cancel the Auto Showcase Lease, but she treated it that way. These findings are

---

[13] *See Alleco Inc. v. Harry & Jeanette Weinberg Foundation, Inc.*, 665 A.2d 1038, 1047-1048 (Md. 1995) (To state a claim for fraud in Maryland, a plaintiff must allege: (1) that the defendant made a false representation to the plaintiff; (2) that the defendant knew the representation was false or that it was made with reckless indifference to the truth; (3) that the misrepresentation was made for the purpose of defrauding the plaintiff; (4) that the plaintiff relied on the misrepresentation; and (5) that the plaintiff suffered damages as a result of the misrepresentation.).

based on numerous other findings set forth herein, including (1) the 100% overlap in ownership between the Debtor and Auto Showcase; (2) the Debtor's and Auto Showcase's admission that they view Auto Showcase as "a de facto co-owner" of the Premises; (3) the failure of the parties to distinguish between the Debtor and Auto Showcase in the Lease provisions; (4) the other evidence in the record that Sandra Landsman often failed to distinguish between the two corporate entities; (5) Auto Showcase's failure to pay rent since 2008; (6) the Landsmans' view of the Lease, which was that it was a short-term transaction that would allow the Tenant to purchase the Premises within six months or so; and (7) Sandra Landsman's request to allow Auto Showcase to remain in the Premises for six months to wind down its operations (which would have been unnecessary if she believed Auto Showcase had a right to co-occupy the Premises).[14]  The Debtor cannot point to the Auto Showcase Lease now as a basis to prevent the Tenant from enjoying the benefits of the Lease.

The Common Areas provision of Paragraph 26 does not alter these conclusions. The provision is confusing and inartful.  To the extent it grants the Landlord use of "Common Areas" (a term that is not defined in the Lease) it is not inconsistent with Paragraph 22.  It is vague and passing reference to "any other tenants," did not put the Tenant on notice that Auto Showcase had a lease of *the very same property*.  Nor does it alter the fact that Sandra Landsman completely disregarded the Auto Showcase Lease when she entered into the Lease.

*The Debtor and Auto Showcase Must Vacate the Premises.*

---

[14]  The Court makes this finding even without regard to the statements by the Debtor and Auto Showcase in the motion for consolidation that the lease is "theoretical".  Those statements certainly support the finding herein.

It is apparent that, as long as Auto Showcase occupies the Premises, the situation will not stabilize. It is equally apparent that, for reasons stated previously in this Memorandum, Auto Showcase has no legal right to continue its occupancy. Moreover, the evidence of the dysfunctional relationship was such that the Court has serious concerns about potential harm to individuals or damage to the Premises. Auto Showcase will be ordered to vacate the Premises peacefully and allow the Tenant to use and enjoy the Premises and pay rent in accordance with the Lease.

*Section 365(i)*

In its post-trial brief, the Debtor argues that the option to purchase may make the Lease, in part, an "executory contract for the sale of real property" to which §365(i) applies.[15] It then asserts that the Tenant does not have rights under §365(i) here.

The Tenant has stated unequivocally that it will not exercise the option to purchase under the Lease, thus seemingly rendering the §365(i) issues moot. The parties, however, state that some Lease provisions relating to the option to purchase may have vitality depending on future events. The Court will address the Tenant's rights under §365(i), if any, if and when such issues arise.

## Conclusion

---

[15] Section 365(i) provides in pertinent part:

(i)(1) If the trustee rejects an executory contract of the debtor for the sale of real property or for the sale of a timeshare interest under a timeshare plan, under which the purchaser is in possession, such purchaser may treat such contract as terminated, or, in the alternative, may remain in possession of such real property or timeshare interest.

(2) If such purchaser remains in possession--

(A) such purchaser shall continue to make all payments due under such contract, but may, offset against such payments any damages occurring after the date of the rejection of such contract caused by the nonperformance of any obligation of the debtor after such date, but such purchaser does not have any rights against the estate on account of any damages arising after such date from such rejection, other than such offset; and

(B) the trustee shall deliver title to such purchaser in accordance with the provisions of such contract, but is relieved of all other obligations to perform under such contract.

For the foregoing reasons the Court will enter an order (1) approving the Debtor's rejection of the Lease; (2) determining that the Tenant has not forfeited its right to remain in possession under §365(h); and (3) ordering that the Debtor and Auto Showcase, peacefully and without harm to persons or property, vacate the Premises and allow the Tenant the use and enjoyment of the Premises. The amount of the Tenant's claims against the Debtor will be determined in further proceedings.

cc:     Debtors
        Debtors' Counsel
        A&H Motors, Inc.
        A&H Motors, Inc.'s Counsel
        United States Trustee

**End of Memorandum**